**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **PENNSYLVANIA NATIONAL MUTUAL** | ) |
| **CASUALTY INSURANCE COMPANY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )  **CIVIL ACTION 09-0089-WS-B** |
| | ) |
| **BRANDY EDMONDS,** | ) |
| | ) |
| **Defendant.** | ) |

**ORDER**

This matter comes before the Court on plaintiff's Motion for Default Judgment (doc. 33) and supporting evidentiary submission.

**I.      Relevant Background.**

This action concerns the misappropriation of hundreds of thousands of dollars belonging to a Mobile, Alabama metal fabricating company called Centerline, Inc. d/b/a the Coppersmith ("Centerline") by one of its former employees, defendant Brandy Edmonds.

In the Complaint (doc. 1) filed on February 20, 2009, plaintiff, Pennsylvania National Mutual Casualty Insurance Company ("Penn National"), set forth very specific allegations describing Edmonds' course of conduct in stealing from her employer.[1]  The Complaint alleged that Edmonds worked for Centerline as a bookkeeper and office manager, pursuant to which her job duties included payment of legitimate invoices submitted to Centerline and deposit of

---

[1]      All well-pleaded factual allegations in the Complaint are deemed admitted by virtue of defendant's default.  *See, e.g., Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1307 (11th Cir. 2009) (defaulting defendant "admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by the judgment, and is barred from contesting on appeal the facts thus established") (citation omitted); *Nishimatsu Const. Co., Ltd. v. Houston Nat. Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975) ("The defendant, by his default, admits the plaintiff's well-pleaded allegations of fact."); *Capitol Records v. Carmichael*, 508 F. Supp.2d 1079, 1084 n.3 (S.D. Ala. 2007) ("The effect of a default is to render all well-pleaded factual allegations of the complaint (except those relating to damages) admitted.").

customer checks in Centerline's corporate checking account.  (Doc. 1, ¶¶ 6, 8.)  In performing these duties, "Edmonds engaged in an intentional, systematic campaign of misappropriating company funds for her personal use."  (*Id.* at ¶ 9.)  As reflected in the Complaint, Edmonds' theft from Centerline was accomplished through the following types of conduct: (i) use of Centerline credit cards to make unauthorized charges and payment of the ensuing invoices with Centerline funds; (ii) deposit of Centerline customer checks in Edmonds' personal bank account; (iii) frequent, unauthorized counterwithdrawal of funds from Centerline's checking account, resulting in cash transfers from that account to Edmonds; and (iv) overpayment of Edmonds and her husband through Centerline payroll checks.  (*Id.* at ¶¶ 10-13.)[2]  As of the filing of the Complaint, it was estimated that Edmonds had misappropriated at least $250,000 through these methods over a period spanning several years.  (*Id.* at ¶ 14.)

As noted, the named plaintiff is Penn National, not Centerline, the employer who was directly injured by Edmonds' misconduct.  However, the Complaint adequately explained Penn National's involvement in the case, and its standing to pursue causes of action against Edmonds. In particular, the well-pleaded factual allegations of the Complaint reflect that Centerline maintained an insurance policy and fidelity bond (collectively, the "Policy") with Penn National for the period from December 8, 2004 through December 8, 2008, that the Policy covered losses caused by employee dishonesty, that Centerline had made a claim on the Policy after discovering Edmonds' transgressions, that Penn National had paid its insured $150,000 on the claim, and that further payments were contemplated (up to a total of $500,000 or more) as the investigation continued.  (*Id.* at ¶¶ 16-18, 53-54, 61-62, 67-68, 73-74, 81-82.)  The Complaint also referenced

---

[2]     The Complaint amplified each of these categories of misconduct with additional facts.  With respect to credit cards, the Complaint included allegations that Edmonds had charged approximately $138,399.08 in personal, unauthorized expenses on a Centerline corporate American Express credit card between 2005 and April 2008, as well as $10,564.77 on a Centerline corporate credit card with Advanta, and had then paid those bills using funds from Centerline's checking account or line of credit.  (*Id.* at ¶¶ 21-32.)  As to customer checks, the Complaint alleged that in 2006, Edmonds had taken customer checks payable to Centerline in amounts approximating $22,000 and had deposited or cashed those checks for personal use.  (*Id.* at ¶¶ 33-37.)  The Complaint further alleged that between October 2005 and February 2008, Edmonds improperly withdrew approximately $75,000 from the Centerline checking account via counterwithdrawals or checks written to herself.  (*Id.* at ¶ 41.)

an Assignment of Claims agreement through which Centerline "assigned to Penn National any and all claims it may have for losses that occurred prior to the Policy period." (*Id.* at ¶ 19.)[3] The Complaint indicated that Penn National was bringing this action "as subrogee and assignee of Centerline to recover monies paid to Centerline pursuant to the Policy." (*Id.* at ¶ 20.)

Based on these allegations, Penn National brought five causes of action against Edmonds, including claims for conversion (predicated on allegations that Edmonds had wrongfully exercised dominion and control over Centerline's checking account and customer checks), civil theft / embezzlement (again, based on Edmonds having stolen funds from Centerline's checking account and customer checks payable to Centerline), unjust enrichment (based specifically on Edmonds' theft of assets from the Centerline checking account as well as customer checks payable to Centerline), breach of duty of loyalty and fiduciary duty (again pertaining to theft of funds from the Centerline checking account and diversion of customer checks), and suppression of facts concerning the misappropriated assets.

Edmonds was served with process on March 20, 2009, when a private process server delivered copies of the summons and complaint to Edmonds at an address in Chunchula, Alabama. (Doc. 11.) Despite such service, Edmonds did not appear or defend against plaintiff's claims within the time prescribed by the Federal Rules of Civil Procedure. Upon proper application by plaintiff, the Clerk of Court entered a default against Edmonds on April 28, 2009, pursuant to Rule 55(a), Fed.R.Civ.P. (Doc. 17.) On April 29, 2009, the undersigned entered an Order (doc. 19) that, *inter alia*, placed Edmonds on notice of the pending default proceedings. That April 29 Order unequivocally alerted Edmonds that if she or her representative did not appear in this action, she would not be entitled to, and would not be given, any further notice concerning Penn National's efforts to secure a default judgment against her. Despite this notice, which was mailed to her service address, Edmonds has never appeared or participated in this litigation.

After a stay of more than seven months to enable Penn National to complete its

---

[3]    This Assignment conferred upon Penn National the right to sue Edmonds for losses to Centerline predating the December 2004 coverage date under the Policy. That detail is significant because the wrongdoing for which Penn National seeks recovery in these proceedings stretches back to early 2003, well before the Policy's effective date.

investigation of Centerline's insurance claim, plaintiff filed a Motion for Default Judgment (doc. 33). In that Motion, Penn National seeks entry of default judgment against Edmonds in the total amount of $567,885.76, consisting of $359,167.08 in Penn National losses covered by the Policy, an additional $58,781.68 in non-covered losses to Centerline that predate the Policy, and $150,000 in punitive damages.

## II.     Analysis.

### A.     *Propriety of Default Judgment.*

In this Circuit, "there is a strong policy of determining cases on their merits and we therefore view defaults with disfavor." *In re Worldwide Web Systems, Inc.*, 328 F.3d 1291, 1295 (11th Cir. 2003); *see also Varnes v. Local 91, Glass Bottle Blowers Ass'n of U.S. and Canada*, 674 F.2d 1365, 1369 (11th Cir. 1982) ("Since this case involves a default judgment there must be strict compliance with the legal prerequisites establishing the court's power to render the judgment."). Nonetheless, it is well established that a "district court has the authority to enter default judgment for failure ... to comply with its orders or rules of procedure." *Wahl v. McIver*, 773 F.2d 1169, 1174 (11th Cir. 1985).

Where, as here, a defendant has failed to appear or otherwise acknowledge the pendency of a lawsuit for nearly a year after being served, entry of default judgment is appropriate. Indeed, Rule 55 itself provides for entry of default and default judgment where a defendant "has failed to plead or otherwise defend as provided by these rules." Rule 55(a), Fed.R.Civ.P. In a variety of contexts, courts have entered default judgments against defendants who have failed to defend the claims against them following proper service of process.[4] In short, then, "[w]hile modern courts do not favor default judgments, they are certainly appropriate when the adversary

---

[4]     *See, e.g., In re Knight*, 833 F.2d 1515, 1516 (11th Cir. 1987) ("Where a party offers no good reason for the late filing of its answer, entry of default judgment against that party is appropriate."); *Matter of Dierschke*, 975 F.2d 181, 184 (5th Cir. 1992) ("when the court finds an intentional failure of responsive pleadings there need be no other finding" to justify default judgment); *Kidd v. Andrews*, 340 F. Supp.2d 333, 338 (W.D.N.Y. 2004) (entering default judgment against defendant who failed to answer or move against complaint for nearly three months); *Viveros v. Nationwide Janitorial Ass'n, Inc.*, 200 F.R.D. 681, 684 (N.D. Ga. 2000) (entering default judgment against counterclaim defendant who had failed to answer or otherwise respond within time provided by Rule 12(a)(2)).

process has been halted because of an essentially unresponsive party." *Flynn v. Angelucci Bros. & Sons, Inc.*, 448 F. Supp.2d 193, 195 (D.D.C. 2006) (citation omitted). That is precisely what Edmonds has done here.

The law is clear, however, that Edmonds' failure to appear and the Clerk's subsequent entry of default do not automatically entitle Penn National to a default judgment in the requested (or any) amount. Indeed, a default is not "an absolute confession by the defendant of his liability and of the plaintiff's right to recover," but is instead merely "an admission of the facts cited in the Complaint, which by themselves may or may not be sufficient to establish a defendant's liability." *Pitts ex rel. Pitts v. Seneca Sports, Inc.*, 321 F. Supp.2d 1353, 1357 (S.D. Ga. 2004); *see also Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1204 (5th Cir. 1975) (similar); *Descent v. Kolitsidas*, 396 F. Supp.2d 1315, 1316 (M.D. Fla. 2005) ("the defendants' default notwithstanding, the plaintiff is entitled to a default judgment only if the complaint states a claim for relief"). Stated differently, "a default judgment cannot stand on a complaint that fails to state a claim." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1370 n.41 (11th Cir. 1997); *see also Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1307 (11th Cir. 2009) ("A default defendant may, on appeal, challenge the sufficiency of the complaint, even if he may not challenge the sufficiency of the proof.").

In light of these principles, the Court has reviewed the Complaint and is satisfied that it sets forth viable causes of action against Edmonds under Alabama law. The intentional misconduct ascribed to Edmonds in the Complaint (to-wit, making unauthorized personal charges on corporate credit cards, paying for those charges using funds in Centerline's checking account, depositing customer checks payable to Centerline in her personal account or cashing them for her personal use, making unauthorized counterwithdrawals from Centerline's checking account, overpaying herself and her husband through payroll checks, and concealing her wrongdoing for years) is pleaded with sufficient detail to state cognizable claims for conversion, civil theft / embezzlement, unjust enrichment, breach of duty of loyalty / fiduciary duty, and fraudulent suppression. Because all of these well-pleaded factual allegations are deemed admitted by virtue of Edmonds' default, the Court finds that she is liable to Penn National.

The Court having determined that Edmonds' non-responsiveness justifies entry of default judgment against her under Rule 55, Fed.R.Civ.P., and that the well-pleaded factual allegations

that Edmonds has admitted through her default are sufficient to establish her liability to Penn National on the stated legal theories, the only remaining question is the amount of damages to which Penn National is entitled.

### B.     Adequacy of Plaintiff's Proof of Damages.

"While well-pleaded facts in the complaint are deemed admitted, plaintiffs' allegations relating to the amount of damages are not admitted by virtue of default; rather, the court must determine both the amount and character of damages."  *Virgin Records America, Inc. v. Lacey*, 510 F. Supp.2d 588, 593 n.5 (S.D. Ala. 2007); *see also Eastern Elec. Corp. of New Jersey v. Shoemaker Const. Co.*, 652 F. Supp.2d 599, 605 (E.D. Pa. 2009) ("A party's default does not suggest that the party has admitted the amount of damages that the moving party seeks.").  Even in the default judgment context, "[a] court has an obligation to assure that there is a legitimate basis for any damage award it enters."  *Anheuser Busch, Inc. v. Philpot*, 317 F.3d 1264, 1266 (11th Cir. 2003); *see also Credit Lyonnais Securities (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999) (even where default judgment is warranted based on failure to defend, allegations in complaint with respect to damages are not deemed true, and district court must conduct inquiry to ascertain damages with reasonable certainty); *Patray v. Northwest Pub., Inc.*, 931 F. Supp. 865, 869-70 (S.D. Ga. 1996) (it is proper exercise of judicial power for court upon default to take evidence, fix amount which prevailing party should recover, and then give judgment).

In that regard, the Eleventh Circuit has explained that "[f]ederal law similarly requires a judicial determination of damages absent a factual basis in the record," even where the defendant is in default.  *Anheuser Busch*, 317 F.3d at 1266.  Ordinarily, unless a plaintiff's claim against a defaulting defendant is for a sum certain, the law "requires the district court to hold an evidentiary hearing" to fix the amount of damages.  *S.E.C. v. Smyth*, 420 F.3d 1225, 1231 (11th Cir. 2005).  However, no hearing is needed "when the district court already has a wealth of evidence from the party requesting the hearing, such that any additional evidence would be truly unnecessary to a fully informed determination of damages."  *Id.* at 1232 n.13.[5]

---

[5]     *See also Flynn v. Extreme Granite, Inc.*, --- F. Supp.2d ----, 2009 WL 4363218, *2 (D.D.C. Dec. 3, 2009) (district court is not required to hold hearing to fix damages in default judgment context as long as it ensures there is a basis for damages specified); *Eastern Elec. Corp.*, 652 F. Supp.2d at 605 ("In considering the amount of damages ..., the Court may make its

Here, Penn National has come forward with extensive affidavits and other documentation to support the requested damage award.  In particular, plaintiff submits the Affidavit of Katheryn R. Scott, a certified fraud examiner and forensic financial analyst who studied Centerline's financial records pertaining to Edmonds' misconduct and prepared a comprehensive 56-page report (which is appended to the Affidavit) detailing her investigation and findings.  (Doc. 34, Exh. A.)  By Scott's calculations, the total loss to Centerline arising from Edmonds' misappropriation of funds between January 2003 and April 2008 is $417,885.76.  (*Id.* at ¶ 7.) Scott's research, investigation and conclusions concerning the Edmonds matter were independently audited by Gregory B. Pellish, a certified public accountant who also submitted an affidavit in support of Penn National's Motion for Default Judgment.  (*See* Doc. 34, Exh. C.) Based on his review of Scott's report, Pellish opined that her conclusions and loss figures were well-documented, reasonable, and derived from an extensive forensic audit.  (*Id.* at ¶¶ 6-7.)

In further support of its damages request, Penn National submits the Affidavit of Mark Broadrick, a general adjuster for Penn National.  Broadrick confirms that Centerline made a claim to Penn National in April 2008 under the applicable fidelity bond for employee dishonesty loss.  (Doc. 34, Exh. B at ¶ 4.)  Broadrick avers that Penn National investigated this claim for more than a year, after which it concluded that, as a result of Edmonds' fraudulent activities, Centerline had suffered an employee dishonesty loss in the amount of $417,885.76 between January 2003 and April 2008.  (*Id.* at ¶¶ 6, 10.)  According to Broadrick, the portion of that loss covered by the Penn National fidelity bond (coverage for which did not commence until December 8, 2004, some 23 months after Edmonds' fraudulent activity began) was $359,167.08.

---

determination by conducting a hearing or by receiving detailed affidavits from the claimant."); *Virgin Records*, 510 F. Supp.2d at 593-94 ("Where the amount of damages sought is a sum certain, or where an adequate record has been made via affidavits and documentary evidence to show ... damages, no evidentiary hearing is required."); *Natures Way Marine, LLC v. North American Materials, Inc.*, 2008 WL 801702, *3 (S.D. Ala. Mar. 24, 2008) ("Although the trial court must make determinations as to the amount and character of damages, it is not necessary to conduct an evidentiary hearing to fix damages if the amounts sought by plaintiff are adequately supported by supporting affidavits and other documentation.").

(*Id.* at ¶ 11.)[6]  The Broadrick Affidavit also establishes that Penn National ultimately paid Centerline the sum of $359,167.08 based on its investigation of the claim.  (*Id.* at ¶¶ 13, 14.) Finally, Broadrick shows that Penn National and Centerline had entered into an agreement whereby Centerline "assigned all of its rights against Edmonds to Penn National, encompassing the entire Loss, not just the portion of the Loss covered by the Bond."  (*Id.* at ¶ 16.)  This arrangement was also pleaded in the Complaint as a factual matter.

On the basis of that factual showing, Penn National seeks an award of damages against Edmonds in the total amount of $417,885.76, representing the entire loss incurred by Centerline, rather than just the portion for which Penn National provided coverage.  In light of this comprehensive and meticulous evidentiary submission, the Court is satisfied that plaintiff has met its burden of making an adequate showing of damages, and that no evidentiary hearing is required to fix those amounts.  Simply put, Penn National has furnished this Court with all necessary information to make a determination of the amount of damages; therefore, no hearing will be conducted.  After consideration of the record materials, and bearing in mind plaintiff's burden of proving its damages, the Court finds that the total loss to Penn National from Edmonds' misconduct is $359,167.08.  The Court further finds that Centerline suffered an additional loss of $58,781.68 because of Edmonds' activities, which loss was not covered by Penn National's insurance policies and fidelity bonds issued to Centerline because it predated the December 8, 2004 coverage date; nonetheless, because Centerline has assigned that portion of the claim to Penn National and the Complaint apprised Edmonds of that assignment, Penn National can properly claim that additional sum as part of the compensable losses.

## C.  *Discrepancy Between Complaint and Damages Sought.*

Notwithstanding the foregoing, Penn National is not entitled to the full measure of damages delineated in its evidentiary submission accompanying its Motion for Default Judgment.  The sticking point is that there is a disconnect between the relief sought in the Complaint and that for which Penn National is petitioning the Court in its Rule 55 motion.  The

---

[6]      This figure is firmly grounded in Scott's report, pages 5 and 12 of which summarize data demonstrating that of the total loss of $417,885.76, some $359,167.08 "occurred during the time that [Centerline] was bonded" through Penn National.  (Doc. 34-1, at 18.)

Complaint is confined to specific, narrow allegations of misconduct by Edmonds, including (i) using company credit cards to make unauthorized purchases and paying those credit card invoices with company funds, (ii) depositing customer checks payable to Centerline in her personal bank account or cashing them for her personal use, (iii) engaging in unauthorized counterwithdrawals from Centerline's checking account and/or writing checks to herself to transfer cash from that account to her, and (iv) overpaying herself and her husband through payroll checks.  (Doc. 1, ¶¶ 10-13, 21-41.)  The Complaint does not couch this in-depth recitation of Edmonds' fraudulent schemes as illustrative, rather than exhaustive.  It does not allege that she engaged in other types of fraudulent behavior.  It does not place defendant on notice that Penn National is seeking to recover funds beyond these specifically enumerated categories of misappropriation.  It lacks any kind of catch-all language that might reasonably evince an intent to claim damages for other types of fraudulent activities by Edmonds.  Similarly, although the Complaint mentions Centerline's line of credit in passing on two occasions, nowhere does the 12-page, 82-paragraph pleading suggest that Edmonds' wrongful conduct led to a vast increase in Centerline's interest obligations on that line of credit, much less that Penn National seeks recovery of those interest payments here.

These limitations in the pleading are of considerable importance for default judgment purposes, because plaintiff's evidence of damages encompasses items omitted from the Complaint.  In particular, Penn National's proposed damages figure includes sums attributable to Edmonds' theft of petty cash funds ($3,239.12), diversion of cash payments intended for petty cash ($771.20), travel advance irregularities ($56,162.00), skimming of customer payments via a lapping scheme (*i.e.*, application of second customer's check to a first customer's account to conceal the theft of the first customer's payment) ($9,014.00), on-line payments of Edmonds' personal charge and service accounts (as opposed to Centerline charge accounts) using funds from Centerline's bank account ($26,394.90), and increased interest obligations of Centerline based on the elevated line of credit balance arising from Edmonds' misconduct ($67,018.64).  (*See* doc. 34, Exh. A, at 11, 16-18, 22-43.)  The Complaint references none of these forms of misappropriation or loss.

The law is quite clear that a plaintiff seeking a default judgment is confined to the specific factual allegations and demands delineated in the Complaint.  A default judgment "does

not give the plaintiff a blank check to recover from the defaulting defendant any losses it had ever suffered from whatever source." *Jackson v. Correctional Corporation of America*, 564 F. Supp.2d 22, 27 (D.D.C. 2008) (citations omitted). Rather, recovery is limited to the kind and amounts of losses set forth in the pleadings. The Federal Rules of Civil Procedure emphasize the point by stating that "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Rule 54(c), Fed.R.Civ.P.; *see also WMS Gaming Inc. v. WPC Productions Ltd.*, 542 F.3d 601, 606 (7th Cir. 2008) ("because this was a default judgment, the usual rule that a party should be given the relief to which it is entitled whether or not it has requested that relief does not apply"); *Ward v. Real Ships, Inc.*, 2009 WL 3528365, *5 n.12 (S.D. Ala. Oct. 22, 2009) ("It is improper for a plaintiff to expand the tenor and scope of its factual allegations in ... default judgment proceedings."); *United States v. Giles*, 538 F. Supp.2d 990, 994 (W.D. Tex. 2008) ("the relief prayed for in a complaint defines the scope of relief available on default judgment"); *Capitol Records v. Carmichael*, 508 F. Supp.2d 1079, 1084 (S.D. Ala. 2007) (notwithstanding defendant's default, "judgment may be granted only for such relief as may lawfully be granted upon the well-pleaded facts alleged in the complaint") (citation omitted).

The case of *Silge v. Merz*, 510 F.3d 157 (2nd Cir. 2007), is instructive on this issue. In *Silge*, the plaintiff sought an award of pre-judgment interest from a defaulted defendant, but the complaint omitted reference to any such claim. After observing that the plaintiff's failure to articulate a demand for pre-judgment interest limited his damages under Rule 54(c), the appellate court explained that

> "This is a sensible rule. Because complaints can be long and intricate, a lawyer is often required to help a defendant gain a full understanding of the plaintiff's claims. By limiting damages to what is specified in the 'demand for judgment,' the rule ensures that a defendant who is considering default can look at the damages clause, satisfy himself that he is willing to suffer judgment in that amount, and then default without the need to hire a hire a lawyer."

*Id.* at 160 (footnote omitted).

Simply stated, the Complaint does not demand relief for Edmonds' theft of petty cash funds, diversion of cash payments intended for petty cash, travel advance irregularities, lapping scheme for customer payments, on-line payments of Edmonds' personal charge and service

accounts, or increased interest obligations arising from Edmonds' draw-down of Centerline's line of credit. A defendant reviewing the Complaint and deciding whether or not to defend against Penn National's claims would not reasonably be on notice that these categories of fraud were in play, given the specificity of the Complaint and the omission of these items.[7] Accordingly, under Rule 54(c) and the case authorities cited above, the Court excludes these categories of compensatory damages, which equate to $162,599.86 in the aggregate, according to plaintiff's evidence. After subtracting this excluded amount from the total loss proven by plaintiff (which, again, is $417,885.76), the Court awards compensatory damages to Penn National in the amount of **$255,285.90**.

>        **D.       *Award of Punitive Damages.***

Finally, Penn National requests that the default judgment include an award of punitive damages in the amount of $150,000. In contrast to the excluded categories of compensatory damages discussed *supra*, Penn National properly pleaded a demand for punitive damages. Indeed, the *ad damnum* clause of the Complaint specifically requests "[p]unitive damages against Edmonds in the amount of $150,000." (Doc. 1, at 12.)

It is hornbook law that "the purpose of punitive damages is not to compensate the plaintiff but to punish the wrongdoer and to deter the wrongdoer and others from committing similar wrongs in the future." *Green Oil Co. v. Hornsby*, 539 So.2d 218, 222 (Ala. 1989). Under Alabama law, "[p]unitive damages must be supported by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff." *Liberty Nat'l Life Ins. Co. v. Sanders*, 792 So.2d 1069, 1078 (Ala. 2000) (citation and internal quotation marks omitted). A finder of fact awarding punitive damages must, in fixing the amount, "take into consideration the character and degree of the

---

[7]     The Court is well aware that Penn National's investigation and claims process were ongoing when the Complaint was filed. As such, it is entirely possible that Penn National did not learn of these types of misdeeds, or these elements of loss, until sometime later. Be that as it may, Penn National could have amended the pleadings when these other facts became known to it, so as to provide the requisite notice to Edmonds and to comport with Rule 54(c) and the accompanying case law. Because amendment was never sought, the damages award in this case is necessarily constrained by the specific allegations of the Complaint, which lock plaintiff into particular theories of misappropriation to the exclusion of all others.

wrong as shown by the evidence in the case, and the necessity of preventing similar wrongs." *Alabama Pattern Jury Instructions - Civil* (2nd ed.), § 11.03. Alabama courts have authorized the award of punitive damages in various circumstances of intentional tort, fraud and conversion.[8]

The clear and convincing evidence before the Court is that Edmonds methodically and systematically abused her position of trust at Centerline to raid its coffers, divert its income stream, and bankroll her personal expenditures for more than five years. This shameless misappropriation of corporate assets was carried out via scores of transactions, and was accompanied by extensive measures to conceal her wrongdoing and keep her victim in the dark. In short, the admitted allegations of the Complaint show that Edmonds engaged in an extensive campaign of deceit through which she stole hundreds of thousands of dollars from her employer over a prolonged time period, and manipulated corporate accounting to evade detection. Under the circumstances, the Court agrees with plaintiff that an award of punitive damages is reasonable and appropriate in this case to punish the wrongdoer and to deter similar misconduct in the future. Moreover, the Court is of the opinion that the $150,000 award requested by Penn National is justified, in light of the character and degree of the wrong, and the necessity of preventing similar wrongs. Accordingly, upon consideration of all of the foregoing, the Court will impose an award of punitive damages against defendant in the sum of **$150,000.00**.

## III.     Conclusion.

For all of the foregoing reasons, plaintiff's Motion for Default Judgment (doc. 33) is **granted in part, and denied part**. A default judgment will be entered in favor of plaintiff,

---

[8]     *See, e.g., Industrial Technologies, Inc. v. Jacobs Bank*, 872 So.2d 819, 826 (Ala. 2003) ("Punitive damages ... are justified when the evidence discloses the conversion to have been committed in known violation of law and of owner's rights, with circumstances of insult, or contumely, or malice.") (citations omitted); *Tillis Trucking Co. v. Moses*, 748 So.2d 874, 887 n.12 (Ala. 1999) ("Intentional torts ordinarily carry punitive damages, if the jury chooses to award them."); *Griggs v. Finley*, 565 So.2d 154, 162 (Ala. 1990) ("if the misrepresentation is shown to have been made with knowledge that it is false, then the law permits punitive damages by way of punishment"); *Southern States Ford, Inc. v. Proctor*, 541 So.2d 1081, 1087 (Ala. 1989) ("Generally speaking, punitive damages are awardable in all intentional tort cases ....") (Hornsby, C.J., concurring); *Carnival Cruise Lines, Inc. v. Goodin*, 535 So.2d 98, 101 (Ala. 1988) ("If the evidence establishes an intent to defraud or deceive, the law permits the imposition of punitive damages.").

Pennsylvania National Mutual Casualty Insurance Company, and against defendant, Brandy Edmonds, in the total amount of **$405,285.90**, representing compensatory damages to reimburse Penn National for its loss (and for the subrogated loss of Centerline that predated Penn National's coverage obligations) and punitive damages to punish and deter defendant's intentional wrongs.

A separate default judgment will enter.

DONE and ORDERED this 3rd day of March, 2010.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE